# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

GEORGE FULTON,                                    Civil Action No. 1:05-cv-316
      Petitioner,

                                  Dlott, J.

      vs.                                      Hogan, M.J.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,                                      **REPORT AND**
      Respondent.                           **RECOMMENDATION**

      Petitioner, a state prisoner, brings this case through counsel seeking a Writ of Habeas

Corpus pursuant to 28 U.S.C. §2254.  The case is now before the Court upon the petition

(Doc. 1), respondent's return of writ and exhibits thereto (Doc. 6), the trial transcript (Doc. 8),

the voire dire transcript of March 26, 2002 (Doc. 12), and petitioner's traverse. (Doc. 13).

## I.  PROCEDURAL HISTORY

### A.  Facts

      This case involves the following facts, as summarized by the Twelfth District Ohio Court

of Appeals:[1]

> {¶ 2} Appellant and Melissa Loggins were married in February of 1984. Their
> first child, A.F., was born on August 16, 1984. Two additional children were born
> issue of the marriage in 1986 and 1988, respectively.
>
> {¶ 3} The parties divorced in February 1991. Melissa obtained custody of the
> children. Appellant had "guideline" visitation with the children every other
> weekend at his home in Goshen, Ohio. In late September 2000, at the age of 15,
> A.F. told her mother that appellant had raped her in 1991 when she was six years
> old. A.F. stated the rape occurred while she was visiting appellant. A.F. told her
> mother that while she was watching MTV at appellant's residence, he asked her to

---

[1]The factual findings of the state appellate court are entitled to a presumption of correctness in the absence
of clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *see McAdoo v. Elo*, 365 F.3d 487, 493-94
(6th Cir. 2004).

watch television with him in his bedroom. A.F. stated that appellant was only wearing his underwear, which he removed when she entered the room. She stated that he then asked her to remove all of her clothing, which she did. A.F. told her mother that appellant then poured baby oil on his hand, rubbed it into her vagina, and then engaged in intercourse with her. A.F. also related another incident where she went to sleep at appellant's residence while he was the only other occupant in the dwelling. A.F. stated that she went to sleep wearing clothing, but woke up without her pants and underwear on. Furthermore, when she woke up without her clothing she "was like wet, you know."

{¶ 4} On September 29, 2000, Loggins filed a domestic violence petition in Butler County Domestic Relations Court based on A.F.'s allegations. Upon investigating the allegations, Goshen Police Officer Jeff Lacey discussed the possibility of appellant submitting to a polygraph examination. Appellant and his attorney, Grace Thompson, agreed to the polygraph examination.

{¶ 5} Appellant submitted to a polygraph examination on December 5, 2000. Appellant agreed in writing to "be interviewed and or polygraphed." Trooper James Slusher of the Ohio State Highway Patrol administered the polygraph test. After the test was terminated, appellant admitted to touching A.F.'s bare vagina in the course of giving her a massage.

{¶ 6} Appellant was indicted for rape and gross sexual imposition on December 20, 2000. A jury trial began on March 26, 2002. After the jury was impaneled, the trial court allowed appellee to amend the indictment to change the dates that the charges were alleged to have occurred from between May and September of 1990 to between May and December of 1991. The court declared a mistrial and discharged the jury.

{¶ 7} On April 19, 2002, appellant filed a motion for disclosure of the grand jury proceedings. On September 23, 2002, appellant waived his right to a jury and the matter proceeded to a four-day bench trial. On September 26, 2002 the court announced its verdict, finding appellant guilty of the charges. On October 9, 2002, appellant was sentenced to life in prison and classified as a sexually-oriented offender.

(Doc. 6, Exh. 21 at 1-3).

**B.  Trial Court Proceedings**[2]

On December 20, 2000, Fulton was indicted by a Clermont County, Ohio, grand jury on one count of gross sexual imposition and one count of rape. (Doc. 6, Exh. 1).  Trial commenced on March 26, 2002.  After the jury was sworn in, but prior to opening statements, the State advised the court that they had just received information that the offense dates in the indictment were incorrect.  The trial court amended the indictment but discharged the jury.  Over Fulton's objections, a mistrial was declared.  A continuance was granted to permit Fulton additional time to investigate witnesses.  Also at that time, arguments were heard on Fulton's motion to dismiss; it was denied by the court. (Doc. 8, March 26, 2002 Trial Tr.).

On April 19, 2002, Fulton filed a motion for disclosure of grand jury proceedings and a second motion to dismiss the indictment. (Doc. 6, Exhs. 7 and 8).  On April 30, 2002, the court overruled Fulton's motion to dismiss. (Doc. 6, Exh. 9).  That same day, the court filed its entry amending the indictment and bill of particulars to correct the year of the alleged offenses from 1990 to 1991. (Doc. 6, Exh. 10).  On May 17, 2002, the trial court found that jeopardy should not attach to the offenses charged in the amended indictment and granted Fulton's request for additional preparation time. (Doc. 6, Exh. 11).  On June 17, 2002, the court denied Fulton's motion for disclosure of grand jury proceedings. (Doc. 6, Exh. 12).  On July 3, 2002, the court filed its decision overruling Fulton's renewed motion to dismiss the indictment, finding that double jeopardy did not attached for purposes of a retrial. (Doc. 6, Exh. 13).

Fulton's second trial commenced on September 23, 2002.  Fulton waived his right to a trial by jury and was tried before the court.  On September 26, 2002, Fulton was found guilty as

---

[2]Petitioner agrees with respondent's recitation of the procedural history of his case in the state courts. (Doc. 13 at 4).

charged in the indictment.  On October 11, 2002, Fulton was ordered to serve two years

imprisonment on the charge of gross sexual imposition and a life term for rape, to be served

concurrently. (Doc. 6, Exh. 14).  In addition, Fulton was adjudicated as a sexually oriented

offender. (Doc. 6, Exh. 15).

On October 9, 2002, prior to the sentencing hearing, Fulton filed a motion for a new trial.

(Doc. 6, Exh. 16).  The trial court denied his motion on October 21, 2002. (Doc. 6, Exh. 17).

### C.  Appellate Proceedings

Fulton, represented by the same counsel as at trial, timely appealed his conviction to the

Twelfth District Court of Appeals, Clermont County, Ohio.  Fulton filed his brief on March 24,

2003, presenting six assignments of error as follows:

> 1. The trial court erred in that the verdict was against the manifest weight
> of the evidence.
>
> 2. The trial court erred by not allowing appellant to introduce polygraph
> evidence relevant to the charges.
>
> 3. The trial court erred by overruling appellant's motion to dismiss filed
> April 19, 2002.
>
> 4. The trial court erred by overruling appellant's motion to suppress
> statements.
>
> 5. The trial court erred by not disclosing Children's Protective Services and
> other treatment providers' records which contained information
> beneficial to appellant.
>
> 6.  The trial court erred by not allowing defendant appellant access to a
> transcript of the proceedings before the Grand Jury.

(Doc. 6, Exh. 18).  The State filed a brief in response to which Fulton filed a reply. (Doc. 6, Exh.

19 and 20).  On October 14, 2003, the Court of Appeals affirmed the judgment of the trial

court. (Doc. 6, Exh. 21).

Fulton, through the same counsel, filed a discretionary appeal of his conviction in the

Ohio Supreme Court presenting five propositions of law:

> I. It is constitutionally impermissible for police to lie to a suspect and his attorney
> in order to get the suspect to submit to an interrogation without said counsel
> present, by agreeing that he would only be given a polygraph test regarding the
> allegations then ignoring his request that the encounter stop by instead
> aggressively interrogating, pressuring and coercing him until he makes
> incriminating statement.

> II. The "blanket rule" of *State v. Souel* (1978), 53 Ohio St.2d 123, 372 NE2d
> 1318, generally barring polygraph evidence in criminal cases absent a stipulation
> should no longer apply after *Daubert v. Merrell Dow* (1993), 509 U.S. 579 and
> the Ohio cases following *Daubert* and the adoption of Evidence Rule 702.

> III. Double-jeopardy is violated when, after a jury is impaneled and sworn and
> jeopardy had therefore attached, the court declared a mistrial and discharged the
> jury without the defendant so requesting and over the objection of the defendant
> and the defendant stands trial again.

> IV. It is error to allow the amendment of the indictment to "correct" a variance of
> one year regarding the date of the offense, especially without first holding an
> evidentiary hearing or allowing defendant to review the grand jury transcript to
> determine the reason for the discrepancy.

> V. Although the trial court's determination of credibility and factual issues is due
> considerable deference, it is not unassailable. Where the verdict is based on
> uncorroborated testimony which flies in the face of the evidence and other
> witnesses, logic, and common sense, the verdict must be reversed.

(Doc. 6, Exh. 22).  The State filed a memorandum in response. (Doc. 6, Exh. 23).  On March 3,

2004, the Ohio Supreme Court dismissed the appeal stating it did not involve any substantial

constitutional question. (Doc. 6, Exh. 24).

On May 9, 2005, petitioner, through counsel, filed a Petition for Writ of Habeas Corpus

in this Court raising one ground for relief:

> <u>Ground One</u>:  The Double Jeopardy Clause of the United States Constitution
> barred the retrial of George Fulton after the trial court erroneously assumed that a
> manifest necessity existed for the sua sponte declaration of a mistrial.

5

(Doc. 1 at 7).

## III.  STANDARD OF REVIEW

On federal habeas review, the factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).  *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001).  In addition, the decision of the Ohio court of appeals is binding on this Court unless it is contrary to clearly established law or was based on an unreasonable determination of the facts of record.  *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104- 132, 110 Stat. 1214 ("AEDPA"), a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits in state court unless the adjudication either:

> 1.  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrases "contrary to" and "unreasonable application" have independent meanings:

> A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in ... [Supreme Court] cases, or if it decides a case differently that we have done on a set of materially indistinguishable facts.  The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to

6

the facts of a particular case.  The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable ... and an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002)(citation omitted).

However, as to habeas claims not adjudicated on their merits by the state courts, such due deference does not apply. *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  By its terms, section 2254(d) only applies to constitutional claims that were "adjudicated on the merits in State court proceedings." *Clinkscale v. Carter,* 375 F.3d 430, 436 (6th Cir. 2004) (citing *Maples v. Stegall,* 340 F.3d 433, 436 (6th Cir. 2003)), *cert. denied,* 543 U.S. 1177 (2005).  Where, as here, it appears the state appellate court addressed petitioner's claim of error solely in terms of state law,[3] the deferential standard of review set forth in 28 U.S.C. § 2254(d) is inapplicable. Instead, the Court must review petitioner's double jeopardy claim *de novo*.  *See Maples*, 340 F.3d at 436-37.  *See also Wiggins v. Smith*, 539 U.S. 510 (2003) (reviewing habeas issue de novo where state courts had not reached the question).

Upon review of the entire record, this Court concludes that while this is a close case, petitioner has nevertheless failed to establish a violation of the Double Jeopardy Clause and is not entitled to habeas corpus relief.

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  The guarantee against double jeopardy, made applicable to the states through the Fourteenth Amendment, *Benton v. Maryland,* 395 U.S. 784, 794 (1969), protects against "a second prosecution for the same offense after

---

[3]Petitioner's third assignment of error to the state appellate court presented two sub-issues for review, the first involving double jeopardy and the second concerning the amendment of the indictment.  The Ohio Court of Appeals overruled this assignment of error, relying solely on state law and without addressing petitioner's double jeopardy arguments. (Doc. 6, Exh. 21 at 7-8).

conviction or acquittal." *Palazzolo v. Gorcyca,* 244 F.3d 512, 516 (6th Cir.) (citing *Ohio v. Johnson,* 467 U.S. 493, 498 (1984) and *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)), *cert. denied,* 534 U.S. 828 (2001).

The Double Jeopardy Clause protects individuals "not against being twice punished, but against being twice put into jeopardy." *Ball v. United States,* 163 U.S. 662, 669 (1896).  A defendant is placed in jeopardy in a criminal proceeding when he is put to trial before the trier of fact, either a judge or jury. *United States v. Jorn,* 400 U.S. 470, 479 (1971).  In the case of a jury trial, jeopardy attaches when the jury is seated and sworn. *Crist v. Bretz,* 437 U.S. 28 (1978).

The Double Jeopardy Clause ensures the finality of criminal judgments and also protects a defendant's "right to have his trial completed by a particular tribunal." *Jorn,* 400 U.S. at 484; *see also Arizona v. Washington,* 434 U.S. 497, 503 (1978).  "The public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though 'the acquittal was based upon egregiously erroneous foundation.'" *Washington,* 434 U.S. at 503 (quoting *Fong Foo v. United States,* 369 U.S. 141, 143 (1962)).

The Double Jeopardy Clause reflects the idea that:

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187-188 (1957).  The Double Jeopardy bar also serves as an obstacle to the government's gaining an unfair advantage by learning its weaknesses and the strengths of the defense from the first trial. *United States v. DiFrancesco,* 449 U.S. 117, 128

(1980).  Nonetheless, the Double Jeopardy bar is only absolute when there is a dismissal or

acquittal based on a factual determination of innocence. *United States v. Scott,* 437 U.S. 82

(1978).

When, as here, a criminal prosecution ends without finally resolving the merits of the

charges, retrial is not automatically prohibited.  The defendant's right to have his trial completed

by one tribunal is subordinated to the public's interest in "fair trials designed to end in just

judgments" because of the myriad of circumstances which may necessitate discharging a jury,

many of which do not "invariably create unfairness to the accused." *Washington,* 434 U.S. at

505; *see also United States v. Cameron,* 953 F.2d 240, 242 (6th Cir. 1992).  Where the trial has

not ended in conviction or acquittal, reprosecution is permitted when the defendant either

requests or consents to a mistrial (so long as the government did not provoke the request) or

when the mistrial is justified by "manifest necessity." *DiFrancesco,* 449 U.S. at 130; *United*

*States v. Dinitz,* 424 U.S. 600 (1976).

Consent to a mistrial may be implied "if there is some positive indication from the record

of the defendant's willingness to consent to declaration of a mistrial." *Malinovsky v. Court of*

*Common Pleas of Lorain County, Ohio,* 7 F.3d 1263, 1272 (6th Cir. 1993), *cert. denied,* 510

U.S. 1194 (1994).  The failure to object to a mistrial, alone, is insufficient to manifest consent,

*Glover v. McMackin,*950 F.2d 1236, 1240 (6th Cir. 1991), unless "the sum of the surrounding

circumstances positively indicates this silence was tantamount to consent." *United States v.*

*Gantley,* 172 F.3d 422, 428 (6th Cir. 1999).  To determine whether a defendant consents, the

Court must conduct a "careful examination of the totality of the circumstances." *Id.*

In the absence of a defendant's consent to a mistrial, and in light of the importance of a

9

defendant's right to have his case tried by the original tribunal and a mistrial's frustration of that right, the prosecutor has the "heavy burden" of justifying the mistrial by demonstrating "manifest necessity." *Washington,* 434 U.S. at 505.

Manifest necessity is defined as a "high degree" of necessity, but not an absolute degree of necessity. *Id.* at 506; *see Harpster v. State of Ohio*, 128 F.3d 322, 328 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  The "classic formulation" of the manifest necessity test dates back to an 1824 opinion by Justice Story of the Unites States Supreme Court, stating:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. . . .but, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez,* 22 U.S. 579, 580 (1824).  *See also Washington,* 434 U.S. at 506.

The United States Supreme Court has eschewed the formulation of rules based on categories of circumstances which allow or prohibit retrial, or rules based on the source of the problem causing the mistrial or the beneficiary of the ruling. *Jorn,* 400 U.S. at 480, 486.  Instead, trial courts are directed to refrain from aborting a trial until a "scrupulous exercise of judicial discretion" leads them to conclude that justice would not be served by continuing the proceedings. *Id.* at 484.

A reviewing court must afford deference to the trial court's determination of manifest necessity. *Washington*, 434 U.S. at 511.  The amount of deference depends on the basis for the

mistrial.

Where the basis for the mistrial is unavailability of the prosecution's evidence, the reviewing court exercises "the strictest scrutiny" of the trial court's decision. *Washington,* 434 U.S. at 507.  On the other hand, the trial court's decision to declare a mistrial when the jury is unable to reach a verdict or when the trial judge believes that the jury's impartiality may be compromised is accorded great deference. *Id.* at 509-511.

In determining whether a trial judge exercised sound discretion in declaring a mistrial, a reviewing court considers factors such as whether the trial judge heard the opinions of the parties about the propriety of the mistrial, whether he considered the alternatives to a mistrial, and whether he acted deliberately, instead of abruptly. *Washington,* 343 U.S. at 515-516.  A trial judge exercises "sound discretion" when he engages in "careful consideration and solicitude for the serious consequences attendant upon mistrial." *Johnson v. Karnes*, 198 F.3d 589, 596 (6th Cir. 1999) (quoting *Glover,* 950 F.2d at 1241).

A trial judge is not constitutionally required to make an "explicit finding of 'manifest necessity'" or to explain his mistrial ruling so long as "[t]he basis for the trial judge's mistrial order is adequately disclosed by the record. . . ." *Washington,* 343 U.S. at 516-517.  Yet, the exercise of discretion "stands on much firmer ground" when "it is apparent on the face of the record the reasons for a particular decision, and the analytic process leading to that conclusion." *Glover,* 950 F.2d at 1241.

In the instant case, petitioner's first trial began on March 26, 2002. (Doc. 6, March 26, 2002 Transcript; Doc. 11, March 26, 2002 Voir Dire Transcript).  After the jury was impaneled and sworn, but before opening statements, the State moved to amend the indictment. (Doc. 6,

11

March 26, 2002 Transcript, p. 3).  The State mistakenly dated the crimes as occurring in 1990

instead of 1991. *Id*.  The following colloquy occurred between Judge Ringland, sitting in for

Judge Walker who was unavailable, the assistant prosecutor Mr. Chapman, and petitioner's

counsel Mr. Hayes:

> THE COURT: Counsel, we have some matters which we have informally
> discussed off the record. I think we need to put these on the record and see where
> we're going from there. Mr. Chapman?
>
> MR. CHAPMAN: Yes, Judge. If it please The Court -- Your Honor, when we
> took our break for lunch, I checked with one of my witnesses to get some
> information that I was waiting to receive to fix the date of separation between the
> Defendant and his ex-wife, Melissa, then Fulton, now Loggins, and when I met
> with her, I discovered, Your Honor, that the information that I had received from
> her as recently as this past week was, in fact, not accurate, so that the separation
> date, instead of being in the autumn of 1989 was in the autumn of 1990. As a
> result, Your Honor, the sequence of events that underlie this case occurred, then,
> through the fall of 1990 and into 1991, which is actually the year during which
> this would have happened. Again, it's still when the victim was age six. It would
> have been, actually, the summer that she then turned seven. But
> as a result of that, Your Honor, I'm making a motion, under Rule 7D of the Rules
> of Criminal Procedure, to amend the indictment and the Bill Of Particulars, too, to
> change it from May through September of 1990, on both counts, to May through
> September of 1991, on both counts. And then, likewise, with the two paragraphs
> of the Bill Of Particulars.
>
> THE COURT: All right, for the record, on behalf of Defense?
>
> MR. HAYNES: Your Honor, we are opposed to the motion. We are ready for the
> trial we're in. We've seated the jury. This case has been pending for over a year,
> with the dates of May through September of '90. I have no doubt, at all, that what
> Mr. Chapman said, as far as -- his representation is correct on this, but I want to
> make it clear that we have severe doubt about the source of his information about
> what -- and the reasons behind the change -- and we think that to change the dates of the indictment in th

indictment. What you have is, we think that the dates, May through September of '90, were
presented to the Grand Jury and they indicted, based on what the evidence was that they had.
And that to amend the indictment, especially at this late date, you just can't do that, based on
that. I would ask that you examine the Grand Jury record. I think that we have a particularized
need to look at the Grand Jury record and see what the basis for the evidence is. And I, frankly,
think we ought to have an evidentiary hearing with, what I believe is, Melissa Loggins testifying
as to the reasons for this error in the date and/or Officer Lacy of the Goshen Police Department.

THE COURT: Well, let me indicate that under State v. Lawrenson, the prosecuting attorney has a continuing obligation to attempt to, if not narrow the time, to get the correct time where you have a period of time in an indictment. From the representations made by Counsel, today, Mr. Chapman, he has learned just within a -- I guess, an hour ago -- that the times which he had been led to believe were given to him to support the indictment and Bill Of Particulars were incorrect. He, as I understand -- and correct me if I'm wrong -- upon receiving this information, immediately, disclosed it to Counsel. Is that correct, folks?

MR. CHAPMAN: Yes, Judge.

MR. HAYNES: That's my-- yes.

THE COURT: All right. So with that in mind, there certainly is good faith, or no -- let's put it this way -- no bad faith on behalf of the State, the Prosecuting Attorney's Office, in making this late date change. And so, with that in mind, under 7D, I'm going to permit the motion and permit the amendment. However--

MR. HAYNES: Could I just say one thing, Your Honor?

THE COURT: Sure.

MR. HAYNES: I'm sorry to interrupt you but I just want to make -- my understanding of the record, the way I understand this to have come down is, Mr. Chapman and I talked last night and had, at that point, a discussion about when these parties separated. George Fulton and Melissa, then, Fulton. And Mr. Chapman's impression was that, it was in '89, they were separated for over a year before the divorce was final. I told him, flatly, that I didn't think that was the case. And my understanding is that he has then, today, I guess, has had a conversation -- or, since last night, anyway, had a conversation with Melissa Loggins, now, formerly Melissa Fulton, and that she had then said, "No, that's not when we separated. It was in 1990." But that she had led Mr. Chapman to believe that they were separated for over a year before the divorce was filed and I think that that goes directly to her credibility.

THE COURT: Well, it may and that's why you'll be able to impeach her on that, if you're able to, under 613. However, it does not preclude Mr. Chapman from making an amendment under 7D, which I will grant. However, again, in as much as that may catch you unaware and this matter is obviously set for trial, now, I will give you the opportunity to prepare and to take the necessary time you need to prepare for the impeachment of the witnesses, as well as obtaining witnesses in support of your defense for this new time frame. So, how long do you need?

MR. HAYNES: Your Honor, we, first of all, would move to dismiss, but as far as

your question, we will not be able to do it within a day or two.

THE COURT: Okay.

MR. HAYNES: So I would say, what I'd need to do is -- I talked to my client, briefly, about this, a few minutes ago, for a few minutes -- there are potential witnesses, and so forth, that we frankly haven't looked at because we weren't dealing with those dates until just now.

THE COURT: Are we talking within a week or two weeks or –

MR. HAYNES: No, I think we need to get the investigator out. It would have to be more than that.

THE COURT: All right. So, in lieu of denial of your motion to dismiss, Mr. Haynes, it's my understanding you're asking for additional time to prepare, is that correct?

MR. HAYNES: Yes, I am, Your Honor.

THE COURT: All right. You shall have it. And we'll just have to get this set up for a new trial date. Now, let me indicate that, because of the new date, I believe there was a -- wasn't there a review of some child Children's Protective Services records?

MR. CHAPMAN: Judge, there had been in the past a review conducted by Judge Walker. An in-camera review of records that I had obtained from Hamilton County. When, I think, we looked, there were no Children's Protective Services records in our county or in Butler County.

THE COURT: So, nothing of these records has anything to do with any of the dates involved in this alleged --

MR. HAYNES: I don't know that I –

THE COURT: Then, I guess what we –

MR. HAYNES: I think we might want –

THE COURT: We need to raise that issue, again, with the trial judge to have him review the records, again, concerning any discrepancy in the dates and review the Grand Jury transcript for discrepancy in dates, to determine if there's any particularized need.

14

MR. HAYNES: So, you're not overruling my request for evidentiary hearing. You're deferring that?

THE COURT: I didn't say an evidentiary hearing.  I said it needs to be an in-camera inspection by The Court to determine if there's any particularized need. I don't think an evidentiary hearing is required, at this point. I think a review of the transcripts and records will be all that's required. Now, after that, if the judge feels it necessary, then he will -- or may -- if he wishes, ask for an evidentiary hearing.

MR. HAYNES: All right.

THE COURT: Now, in as much as this was sent over to me, as Administrative Judge, only because Judge Walker was unexpectedly unavailable and so, under the rules of superintendency, it goes back to the original judge.

MR. CHAPMAN: Then, Judge, my understanding is that The Court is going to grant a continuance under Rule 7D. Discharge the jury, declare a mistrial, it will not be a count for double jeopardy, at this point, and then, the matter will be referred to Judge Walker. Maybe we can set a pre-trial next week to get oriented as to when we're going to reschedule.

THE COURT: As far as I'm concerned, it is not a count that's double jeopardy because I've indicated that what you did was -- that no evidence of any bad faith -- that you indicated the information as soon as you received it and, certainly, that's for a reviewing court to review at a later point, but at this time, I'll mistry the case with -- and, again, it's up to Judge Walker to determine if it's double jeopardy but I would assume it would not be.

MR. HAYNES: You note our objection to that.

THE COURT: I note your objection, sir.

MR. HAYNES: Thank you, Your Honor.

THE COURT: Anything further?

MR. CHAPMAN: Not on behalf of the State, Your Honor.

THE COURT: Anything further, on behalf of Defense?

MR. HAYNES: No, Your Honor. Thank you.

THE COURT: Okay….

(Doc. 6, March 26, 2002 Trial Transcript pp. 3-9).

In determining whether the State trial judge exercised sound discretion in declaring a mistrial in petitioner's case, the Court starts by examining: (1) whether the trial judge heard the opinions of the parties about the propriety of the mistrial; (2) whether the trial judge considered the alternatives to a mistrial; and (3) whether the trial judge acted deliberately, instead of abruptly. *Washington,* 343 U.S. at 515-516.

A review of the transcript shows that neither defense counsel or the assistant prosecutor explicitly argued whether "manifest necessity" existed for the declaration of a mistrial. Rather, the focus of the parties' arguments was on the propriety of the amendment of the indictment to reflect the correct dates. (Doc. 6, March 26, 2002 Trial Transcript pp. 3-6). Once the decision was made to permit the amendment, the judge recognized the defense would not be prepared to proceed with the trial that same day. The judge granted the defense's request for additional time to prepare, but never got a definite response as to how much time the defense needed to delay the trial. Only then was there any discussion of a mistrial or double jeopardy when the assistant prosecutor sought clarification of the trial judge's decision: "Then, Judge, my understanding is

16

that The Court is going to grant a continuance under Rule 7D.[4]  Discharge the jury, declare a mistrial, it will not be a count for double jeopardy, at this point, and then, the matter will be referred to Judge Walker. Maybe we can set a pre-trial next week to get oriented as to when we're going to reschedule." (Doc. 6, March 26, 2002 Trial Transcript p. 9).  Perhaps the most troubling aspect of this case is Judge Ringland's response:  "As far as I'm concerned, it is not a count that's double jeopardy because I've indicated that what you did was -- that no evidence of any bad faith -- that you indicated the information as soon as you received it and, certainly, that's for a reviewing court to review at a later point, but at this time, I'll mistry the case with -- and, again, it's up to Judge Walker to determine if it's double jeopardy but I would assume it would not be." (Doc. 6, March 26, 2002 Trial Transcript p.9).

As previously indicated, a judge employs "sound discretion" when he engages in "careful consideration and solicitude for the serious consequences attendant upon mistrial." *Johnson v. Karnes*, 198 F.3d 589, 596 (6th Cir. 1999) (quoting *Glover,* 950 F.2d at 1241).  By "assuming" no double jeopardy implications and by opining that the ultimate determination of whether

---

[4]Ohio Criminal Rule 7(D) governs the amendment of an indictment, information, or complaint and provides:

> The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged.  If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury. Where a jury is discharged under this division, jeopardy shall not attach to the offense charged in the amended indictment, information, or complaint.  No action of the court in refusing a continuance or postponement under this division is reviewable except after motion to grant a new trial therefor is refused by the trial court, and no appeal based upon such action of the court shall be sustained nor reversal had unless, from consideration of the whole proceedings, the reviewing court finds that a failure of justice resulted.

double jeopardy bars re-prosecution was to be made by "a reviewing court" or "Judge Walker," the record may suggest that Judge Ringland did not consider the serious consequences of declaring a mistrial.  In addition, Judge Ringland's response concerning a lack of bad faith on the part of the State may suggest he placed too much emphasis on a single factor, *i.e.,* bad faith, in deciding whether a mistrial was appropriate or warranted.  Although the trial judge heard the opinions of the parties on the propriety of amending the indictment, he did not specifically elicit their opinions on the propriety of a mistrial and the double jeopardy implications thereof.

Nevertheless, the absence of explicit arguments by the parties or findings by Judge Ringland on whether manifest necessity existed for a mistrial does not end this federal court's inquiry on the issue of double jeopardy.  The Supreme Court in *Washington v. Arizona* held that as a matter of constitutional law the trial judge need not make an explicit finding of "manifest necessity" or explain his reasons for declaring a mistrial on the record so long as the record provides a sufficient justification for the state-court ruling.  The question then becomes, does the underlying record in this case nonetheless establish a factual basis showing a high degree of necessity for declaring a mistrial?   For the reasons set forth more fully below, the Court finds the record adequately establishes it was manifestly necessary to declare a mistrial in petitioner's case.

Petitioner contends the "manifest necessity" standard had not been met because the record fails to show Judge Ringland expressly considered a continuance as an alternative to a mistrial.   Petitioner argues the trial judge could have easily polled the jury in a few minutes to determine their availability to reconvene at a later date and to discover any potential future problems with keeping the impaneled jury.  Petitioner also contends the judge could have

requested the jury to reconvene after a two or three week continuance and at that point ask defense counsel whether additional time was necessary before making the decision to declare a mistrial. (Doc. 13 at 10).  In addition, petitioner asserts that the availability of two alternate jurors provided some buffer for any potentially absent jurors.  Petitioner contends that practical alternative were available that the judge failed to explore.

It appears from the transcript that while the trial judge failed to *explicitly* state he was considering alternatives to a mistrial, he in fact explored such alternatives.  One alternative the trial judge quickly rejected was to require petitioner to proceed with the trial on March 26, 2002, the first day of trial, despite defense counsel's statement that he was unprepared to proceed with the trial in view of the amended indictment. (Doc. 6, March 26, 2002 Trial Transcript at p. 6).  In lieu of proceeding with the trial, the trial judge granted defense counsel's request for additional time to prepare. (Doc. 6, March 26, 2002 Trial Transcript at pp. 6-7).  By granting a continuance, the trial court was then required to keep the jury or discharge them.

The transcript reveals that keeping the jury impaneled during a continuance of an indeterminate length of time in excess of two weeks was not practicable under the circumstances. The transcript shows that defense counsel, in response to Judge Ringland's question as to how much time he needed to prepare, stated "a day or two" would not be sufficient.  When the trial judge suggested a continuance of "a week or two weeks," defense counsel indicated he would need more time than that for his investigator to prepare. (Doc. 6, Transcript at 7).  Thereafter, it became apparent that additional time was also needed to allow Judge Walker, the trial judge to whom the case would be returned, to review the Children's Protective Services records and Grand Jury transcript to determine if an evidentiary hearing was needed.  Although petitioner in

19

this habeas proceeding argues the judge could have polled the jury to determine if it could reconvene after "a two- or three-week continuance," at the time of the first trial defense counsel never suggested that he could be ready to proceed in three weeks. Counsel failed to state how much time he in fact needed to prepare his defense before the resumption of the trial.

The trial judge could have reasonably inferred from (1) the indeterminate length of time defense counsel needed to adequately prepare; (2) the time needed for the trial court to review in-camera the Children's Protective Services records and Grand Jury transcript; and (3) the additional time necessary for an evidentiary hearing, if granted, that continuing the trial with the impaneled jury would likely result in less than the requisite 12 members. Although the evidence shows that two alternate jurors were sworn, Judge Ringland could have reasonably determined that under the circumstances (flu season), it was not unlikely that sickness or some other change in circumstances could have prevented at least 12 of the 14 available jurors from continuing to serve at some unspecified point of time in the future.[5] Indeed, the voir dire transcript indicates that Judge Ringland was specifically concerned about the "flu[] going around" and the quick onset of the virus in deciding to pick two alternate jurors. (Voir Dire Transcript of March 26, 2002, p. 108). It is unreasonable to assume that the jurors could have predicted their availability for service at some unspecified point in time in the future even if the judge had polled the jury as petitioner contends.

The Court recognizes that a short continuance is not in and of itself sufficient to warrant

---

[5]Under Ohio law, prospective jurors expect to serve for a term of two weeks, although it may be longer. Pursuant to Ohio Rev. Code § 2313.34(A), "A person who is summoned as a juror and who has actually served as a juror in any county of the state under sections 2313.01 to 2313.46 of the Revised Code for two consecutive calendar weeks shall be discharged by the court, except that the person shall not be so discharged until the close of a trial in which the person may be serving when the person's jury term expires."

a mistrial.  *See, e.g., Harris v. Young*, 607 F.2d 1081, 1085-86 (4th Cir. 1979) (continuance was

less drastic remedy that should have been considered for noncompliance with discovery order),

*cert. denied*, 444 U.S. 1025 (1980); *United States v. McKoy*, 591 F.2d 218, 221-23 (3rd Cir.

1979) (no manifest necessity where court could have ordered recess of ongoing trial for 2-3 days

for new counsel to review trial transcript); *Dunkerley v. Hogan*, 579 F.2d 141, 147 (2d Cir.

1978) ( "short" 7-10 day continuance does not provide "manifest necessity"), *cert. denied*, 439

U.S. 1090 (1979).  However, manifest necessity has been found to exist for a mistrial where a

protracted continuance is impractical or the length of the continuance uncertain.  *See United

States v. Williams*, 717 F.2d 473, 475 (9th Cir. 1983) (manifest necessity found for mistrial given

high probability that many of the jurors would be unavailable on new trial date); *United States v.

Peng*, 602 F. Supp. 298, 305 (S.D.N.Y.) (holding that mistrial may be found where an extended

period of time will elapse before resumption of trial), *aff'd,* 766 F.2d 82 (2d Cir. 1985); *State v

Mendoza,* 101 Wis. 2d 654, 660, 305 N.W.2d 166, 169 (Wisc. App. 1981) (consideration of a

continuance was implicit in judge's statement declaring mistrial because of uncertainty as to

when injured juror could return); *Commonwealth v Robson,* 461 Pa. 615, 622-23, 337 A.2d 573,

577 (Pa. 1975), *cert. denied*, 423 US 934 (1975) (illness of trial judge which prevented

continuation of trial for period of several weeks or more held to constitute "manifest necessity"

for declaration of mistrial).

In the instant case, the record supports a finding that Judge Ringland considered a

continuance, but implicitly determined that keeping the jury impaneled during a continuance of

an uncertain and unspecified length of time in excess of two weeks was impractical under the

circumstances.  The decision to declare a mistrial is within the sound discretion of the trial court,

*Arizona v. Washington*, 343 U.S. at 514, and "a trial judge acts within his sound discretion in rejecting possible alternatives and granting a mistrial if reasonable judges could differ about the proper disposition." *In re Ford,* 987 F.2d 334, 340 (6th Cir. 1992).  While Judge Ringland could have demonstrated more plainly that he seriously considered alternatives, polling the jury as to their future availability would have likely confirmed what the other factors already suggested: that a continuance of the trial for an unspecified length of time was impractical.  Other judges in this situation might have disposed of the problem differently or developed a more thorough record regarding the possible alternatives to a mistrial.  Although another judge may have granted a two or three week continuance, recalled the jury, and polled the jury at that point to determine their availability, a reasonable judge might have ordered a mistrial given the uncertain length of the  continuance with which the parties faced.  As long as the record indicates that the trial court considered alternatives, the failure to poll the members of the jury as to their future availability is not by itself fatal to the declaration of mistrial.   Thus, the Court disagrees with petitioner's contention that Judge Ringland failed adequately to consider feasible alternatives to a mistrial in this case.

The record also shows that Judge Ringland did not act "abruptly" in declaring a mistrial in this case.  After learning of the error in the dates of the indictment and discussing the matter with counsel informally, Judge Ringland reconvened court to make a formal record of the matter and to give the parties an opportunity to address the issues. (Doc. 6, March 26, 2002 Trial Transcript at p. 3).  Judge Ringland declared a mistrial only after engaging in a lengthy colloquy with the lawyers concerning the defense's need to continue the trial to conduct a further investigation and to adequately prepare, as well as the need for the trial court to review in-

22

camera the Children's Protective Services Records and Grand Jury transcript.  The Court cannot characterize the decision to discharge the jury as "abrupt."

The Court also notes that under the circumstances of this case, the declaration of a mistrial and the discharge of the jury did not "invariably create unfairness to the accused" such that the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury was subordinated to petitioner's right to have his trial concluded by the jury selected. *Washington*, 434 U.S. at 505.  The risks that the double jeopardy provision is designed to avoid[6] are largely absent in this case.  No opening statements and no evidence were presented to the jury in petitioner's first trial.  Thus, the prosecution could gain no advantage based upon perceived defects in the first trial.  Nor is there any suggestion that the prosecutor was trying to gain an unfair advantage by amending the indictment on the first day of trial or "using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Washington,* 434 U.S. at 508.  To the contrary, the prosecution was compelled to seek an amendment of the indictment after learning, during the lunch break, that the underlying events occurred in 1991 and not in 1990.  Finally, it is difficult to conceive how the declaration of a mistrial prior to opening statements, testimony, and the disclosure of any defense strategy could have increased the risk that petitioner, though innocent, might have been convicted in his second trial but not by the original jury.

Like the trial court in *Washington v. Arizona*, 434 U.S. at 501, Judge Ringland did not expressly find there was "manifest necessity" for declaring a mistrial or expressly state he

---

[6]These risks include subjecting the defendant to continued embarrassment, expense, and the ordeal of another trial, compelling the defendant to live in a continuing state of anxiety and insecurity, and enhancing the possibility that even though innocent he may be found guilty. *Green v. United States,* 355 U.S. 184, 187-188 (1957).

considered alternative solutions.  Nevertheless, the record in this matter supports a finding of

"manifest necessity" for declaring a mistrial instead of keeping the jury impaneled during a

continuance.  Here, both sides were able to give their arguments for and against amending the

indictment, the need for the continuation of the trial, and the evidentiary matters that needed to

be decided prior to the resumption of the trial, *i.e.*, an in-camera review of the Children's

Protective Services records and Grand Jury transcript.  While not couched in terms of "manifest

necessity" the defense was able to argue the underlying factors and alternatives that needed to be

considered.  In addition, as explained above, it was highly unlikely that the alternative of a

continuance with the impaneled jury was viable.  The judge considered continuing the trial for a

short length of time, but petitioner requested a lengthy continuance necessitating the mistrial.

The trial judge was faced with having to continue the trial for an indeterminate length of time in

excess of two weeks to allow the defense to adequately prepare its case and to allow the trial

court to review in-camera the records of the Children's Protective Services and the Grand Jury

transcript.  Defense counsel requested and Judge Ringland recognized the possibility that an

evidentiary hearing could be required following the in-camera review which would necessarily

delay the trial date even further.  Defense counsel never stated how much time he actually

needed to prepare, nor suggested any particular time frame for a continuation of the trial with the

impaneled jury.  While it is true that Judge Ringland never polled the members of the jury to

ascertain their future availability to serve, this omission was not unreasonable given the

uncertain timing for resuming the trial.

     This Court need not find that the trial court had no alternative but to declare a mistrial.

*Harpster*, 128 F.3d at 328.  Rather, we must find that the trial court had a "high degree" of

necessity for declaring a mistrial. *Washington*, 434 U.S. at 506.  In this case, for the reasons stated above, the Court finds the State trial court's declaration of a mistrial was supported by manifest necessity and did not violate petitioner's rights under the Due Process Clause.


**IT IS THEREFORE RECOMMENDED THAT:**

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED.

2.  A certificate of appealability should issue with respect to the constitutional claim alleged in Ground One of the petition because reasonable jurists could debate whether this claim should have been resolved in a different manner and, alternatively, whether the issue presented in this ground for relief is "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)).

3.  The Court certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith" and, therefore, GRANT petitioner leave to proceed on appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).



Date:   1/10/2007                              s/Timothy S. Hogan
KJ
                                               Timothy S. Hogan
                                               United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GEORGE FULTON,                                          Civil Action No. 1:05-cv-316
      Petitioner,

                                           Dlott, J.
    vs.                                                Hogan, M.J.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,                                            **NOTICE**
      Respondent.


Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).